(87 South. 732)

No. 24382.

## STATE v. BAUMAN.

(Feb. 28, 1921.)

*(Syllabus by. Editorial Staff.)*

1. Statutes ⬦121(1)—Title of Blue Sky Law held sufficient.

The title of Act No. 177 of 1920, commonly called Blue Sky Law, which was "An act to prevent fraud in the sale of certain securities herein defined, providing for supervision and regulation, and providing penalties," is sufficient under Const. art. 31, though it does not mention the establishment of the Commission, since the establishment of such Commission was not the object of the law but only one of the means provided for carrying out the object stated.

2. Statutes ⬦121(1)—Inaccurate language in statute does not affect sufficiency of title.

The fact that the language of the third section of the Blue Sky Law was confusing, in that the pronoun "it" was used to designate one person as well as a corporation, has no bearing on the question whether the title of the statute conforms with the requirements of Const. art. 31.

3. Statutes ⬦121(1)—Title of Blue Sky Law to prevent fraud not insufficient because statute does not define fraud.

The title of the Blue Sky Law, is not insufficient because the statute does not define fraud in the sale of securities, since the fourteenth section of the statute declares what shall be prima facie evidence of fraud in such sale, and it was not necessary that the statute should contain a definition of the word fraud.

4. Statutes ⬦39—Erroneous journal entries held not to show noncompliance with constitutional requirements.

Since the original bill as adopted and approved, which contained the same title as that finally promulgated, showed that it had been read in the House and Senate as required by Const. art. 39, before its enactment, the fact that entries in the House and Senate Journals, in describing the bill as a substitute for another bill which in fact it was, stated the title as it was in the original bill, and not as in the substituted bill, which was grammatically correct in a sense but may have been misleading, does not invalidate the law under that article of the Constitution.

5. Statutes ⬦285—Court may resort to any source to ascertain existence of statute.

Whenever a question arises as to the existence of a statute or its terms, the judges have a right to resort to any source of information in its nature capable of conveying a clear and satisfactory answer to such question, always seeking first for that which in its nature is most appropriate, unless the positive law has enacted a different rule.

Appeal from First Judicial District Court, Parish of Caddo; E. P. Mills, Judge.

Ed Bauman was charged by information with a violation of the Blue Sky Law. From a judgment sustaining defendant's plea that the statute was unconstitutional, the State appeals. Reversed and remanded.

A. V. Coco, Atty. Gen., L. E. Hall, Asst. Atty. Gen., and Lal C. Blanchard, Dist. Atty., of Shreveport, for the State.

Foster, Looney & Wilkinson, of Shreveport, for appellee.

O'NIELL, J. The state appeals from a judgment quashing a bill of information, charging defendant with a violation of Act 177 of 1920 (page 281), commonly called the Blue Sky Law.

Defendant pleaded that the statute was unconstitutional, and the court declared it so.

Defendant's first contention is that the statute violates article 31 of the Constitution, requiring that every law enacted by the General Assembly shall embrace but one object, which shall be expressed in its title. His second contention is that the statute was not passed in conformity with article 39 of the Constitution, requiring that every bill shall be read on three different days in each House and that no bill shall be considered for final passage unless it has been read once in full and has been reported on by a committee.

The title of the statute in question is:

"An act to prevent fraud in the sale of certain securities herein defined; providing for supervision and regulation; and providing penalties."

The first section of the act creates a Commission, called the Louisiana Securities Commission, composed of the Secretary of State, who is made president, the Examiner of State Banks, and the Attorney General; which commission is to administer and provide for the enforcement of the provisions of the act, and is authorized to make such rules and regulations as may be necessary to carry out the provisions of the act.

The second section authorizes the Commission to appoint a secretary, fixes his salary, and limits the expenditures of the Commission.

The third section defines, for the purposes of the act, "a domestic investment company," and defines, also, for the purposes of the act, "a foreign investment company."

The fourth section declares that every foreign or domestic investment company, that shall engage in the business of selling or offering for sale any stocks, bonds or other securities issued by them shall be deemed a regular dealer, within the meaning of the act, and declares that no such dealer shall sell or offer for sale any such securities or engage in the business of offering for sale such securities unless or until such investment company shall have registered with the Louisiana Securities Commission, and shall have furnished, on oath, in such form as the Commission shall prescribe, certain information, specified in that section of the statute, and shall have paid an annual filing and examination fee of $25.

The fifth section requires an additional fee of $5 per annum, called the registration and authorization fee, for each agent of any such investment company or dealer.

The sixth section forbids any dealer to sell or offer for sale any of the stocks, bonds, contracts, certificates, or other securities of any investment company, unless the company shall have complied with all of the provisions of the act, nor until the dealer shall have registered with the Commission under the terms of the act.

The seventh section requires every investment company, before offering for sale any of its stocks, bonds or other securities, to file an irrevocable written consent that suits against it may be commenced in any parish in which a cause of action may arise or in which the plaintiff resides, by service of process on the president of the Louisiana Securities Commission, etc.

The eighth section enumerates the classes of securities which a dealer or investment house may deal in, under a license from the Commission.

The ninth section enumerates the restrictions under which a dealer may sell or negotiate in any other stocks, bonds or other securities not enumerated in section 8.

The tenth section authorizes the Commission to appoint a certified public accountant to make an examination into the books, records, etc., of the issuer of any statement filed with the Commission.

The eleventh section gives the Securities Commission authority to determine whether the plan or scheme outlined in any statement filed with the Commission might work or tend to work a fraud upon the purchaser of such securities as are proposed to be sold; and this section also provides for the issuance of a permit or license, by the Commission, as evidence of authority to sell the securities proposed to be sold.

The twelfth section provides for proceedings to compel the Securities Commission to receive and file statements from applicants for permission to sell securities.

The thirteenth section fixes the penalty to be imposed upon any issuer of securities, or director, trustee or agent of such issuer, or dealer, selling or offering for sale any securities without having complied with the provisions of the act.

The fourteenth section makes it unlawful

for any officer, director, solicitor, broker or agent, to sell or offer for sale any securities not enumerated in the exemptions stated in section 8 in any other manner or form than specifically set forth in the information required to be filed under section 9 of the act; and section 14 also declares that any offer or sale upon any other terms or conditions shall be considered prima facie evidence that the officer, director, trustee, solicitor or agent offered or sold the securities for the purpose of defrauding the investor to whom the securities are offered or sold.

The fifteenth, being the last, section repeals all laws in conflict with the act, particularly Act 40 of 1912.

[1-3] In support of his plea that the statute violates article 31 of the Constitution, defendant contends that the title is too brief and peculiar in its language to afford a clue to the contents of the act. It is said that the title does not contain any suggestion that the purpose of the act is to establish a tribunal or commission before which all persons, corporations or associations having securities for sale must appear and obtain permission to sell such securities. Our answer to the argument is that the establishment of the Securities Commission was not the object of the law, but is only one of the means provided for carrying out the object, to prevent fraud in the selling of the securities defined in the act. It is argued that the language of the third section of the statute is confusing in that the pronoun "it" is used to designate a person as well as a corporation, copartnership or other association. That criticism has nothing to do with the question whether the title of the statute conforms with the requirements of article 31 of the Constitution. Defendant's attorneys contend also that the statute does not contain a definition or an explanation of what should be considered fraud in the sale of securities. They say that fraud has the well-defined legal meaning of a deceitful practice or unlawful device resorted to with intent to deprive another of his right, or in any manner to do him injury. They say that, if the purpose of the statute was to prevent fraud in the sale of the securities therein defined, a person should be able to learn from the act itself what would constitute fraud in the sale of any security. The answer to this argument is that the fourteenth section of the statute does declare what shall be prima facie evidence of fraud in the sale of any securities referred to in the act. It was not necessary that the statute should contain a definition of the word "fraud." The object or purpose of the act was not merely to make it a misdemeanor for any person to commit fraud in the sale of the securities defined in the act. The object or purpose was to prevent fraud in the sale of any securities defined in the act, by providing for supervision over and regulation of sales of such securities, and by providing penalties for a violation of the act. Our opinion is that the title of this statute conforms with the requirements of article 31 of the Constitution.

Although the district judge did not give written reasons for declaring this statute unconstitutional, it appears from the bill of exception reserved by the district attorney that the judge was of the opinion that the statute was not passed in conformity with the requirements of article 39 of the Constitution. The contention of defendant's attorneys, in that respect, is that the entries in the Journal of the House of Representatives, and in the Journal of the Senate, show that, in the third reading of the bill in the House of Representatives and in all readings of the bill in the Senate, the clerk did not read the title under which the act was finally passed and promulgated, but read the title of an act known as House Bill No. 183, of which the statute under discussion, known as House Bill No. 387, was adopted as a substitute.

The official journal of the proceedings of the House of Representatives discloses that the original Blue Sky Law introduced in the House was:

House Bill No. 183—
By Mr. Parent:
An act to prevent unfairness, imposition or fraud in the sale or disposition of certain "securities" herein defined by requiring an inspection thereof, providing for such inspection, supervision and regulation of the business of any person, association, partnership, or corporation, engaged or intending to engage, whether as principal, broker or agent, in the sale of any such securities in the state of Louisiana, as may be necessary to prevent unfairness, imposition or fraud in the sale or disposition of said securities, to define the duties of the Examiner of State Banks and the Attorney General in connection therewith, and prescribing penalties for the violation thereof, and repealing all conflicting laws.

The House Journal also shows that the House Bill No. 183, by Mr. Parent, with its appropriate title, was, on motion of Mr. Parent, referred to Section B of the Judiciary Committee; and that the committee reported by substituting for House Bill No. 183 the statute now under consideration, which substitute, on motion of Mr. Parent, was adopted and became "House Bill No. 387—by Mr. Parent, substitute for House Bill No. 183: An act to prevent fraud in the sale of certain securities herein defined; providing for supervision and regulation; and providing penalties." This substitute bill was read by title and returned to the calender under the rules. The journal shows that the statute in question, described as House Bill No. 387—by Mr. Parent, substitute for House Bill No. 183, and containing the title under which the statute was promulgated, was taken up on second reading and, on motion of Mr. Parent, was ordered engrossed and passed to third reading. The journal shows that the bill was taken up on third reading; that the House resolved itself into a committee of the whole to consider the bill; that the committee recommended certain amendments,

not pertinent to the title of the act; that the report of the committee, together with the amendments, was adopted; and that the bill was then read a third time in full, and was finally passed, the result of the roll call being 84 yeas and 12 nays.

In the record of the proceedings, showing the third reading and final passage of the bill, the statute is described as "House Bill No. 387—by Mr. Parent, substitute for House Bill No. 183: An act to prevent unfairness, imposition or fraud in the sale or disposition," etc., giving the long title of the original House Bill No. 183. In a sense, this entry in the House Journal is correct, notwithstanding it contains the long title of the original House Bill No. 183, of which House Bill No. 387, which was finally passed, was a substitute. There can be no doubt that the title of the act which was read in full a third time and was finally passed was the short title of House Bill No. 387, the substitute for House Bill No. 183; because the original bill which was read by the clerk, bearing the indorsements, showing that it was a substitute for House Bill No. 183, that it was read twice by title and ordered engrossed, and passed to its third reading, that it was considered in the committee of the whole, reported with amendments, read the third time in full and finally passed, and the roll call, etc., is before us and bears the short title of the act which was finally promulgated.

In the entry in the Official Journal of the proceedings of the Senate, of the message from the House of Representatives, informing the Senate that the House had finally passed, and asked the Senate's concurrence in, a number of bills, including House Bill No. 387, the bill is again described as "House Bill No. 387—by Mr. Parent, substitute for House Bill No. 183: An act to prevent unfairness, imposition or fraud," etc., giving the long title of the original House Bill No. 183. It is certain, however, that the Bill No. 387,

which the House of Representatives asked the Senate to concur in, contained the short title under which the statute was finally promulgated; because the original bill, the passage of which was concurred in by the Senate, is before us and bears the short title under which the statute was finally promulgated.

In the record in the Senate Journal, of house bills on second reading, referred to committees, showing that House Bill No. 387 was read by title and referred to Section B of the Judiciary Committee, the bill is again described as "House Bill No. 387—by Mr. Parent, substitute for House Bill No. 183: An act to prevent unfairness, imposition or fraud," etc., being the long title of the original House Bill No. 183. It is certain, however, that the house bill which was read a second time by title and referred to the Judiciary Committee contained the short title under which the act was finally promulgated, because the original bill, bearing the indorsement showing that it was read a first and second time by title and referred to the Committee on Judiciary, Section B, is before us, and it bears the short title under which the statute was finally promulgated.

In the entry in the Senate Journal of the report of the Committee on Judiciary, Section B, reporting the bill favorably, it is again described as "House Bill No. 387—by Mr. Parent, substitute for House Bill No. 183: An act to prevent unfairness, imposition of fraud," etc., being the long title of the House Bill No. 183. There is an indorsement on the original bill, however, corresponding in date with the entry in the Senate Journal, showing that the bill which was reported favorably by the committee, and which was read by title and passed to third reading, bore the short title under which the statute was finally promulgated. It appears that, in the entry of every proceeding in the Senate Journal, with reference to this bill, it was described as "House Bill No. 387—by Mr. Parent, substitute for House Bill No. 183: An act to prevent unfairness, imposition and fraud," etc., being the long title of the original House Bill No. 183. That method of describing the bill was, grammatically and in every other sense, correct. Though it might have been more appropriate, it would have been merely a matter of style of expression for the clerk to have written the short title of House Bill No. 387, after describing it as a substitute for House Bill No. 183. Therefore, even if the writing of the title of the original House Bill No. 183, after describing House Bill No. 387 as a substitute for House Bill No. 183, was an error on the part of the clerk of the House of Representatives, which was perpetuated by the clerk of the Senate, all that could truthfully be said of it is that it was a clerical error. The original bill, as enrolled and signed by the Speaker of the House and the Lieutenant Governor and President of the Senate, and as taken to the Governor for executive approval, bears the short title under which the statute was finally promulgated; and so does the finally typewritten statute, approved and signed by the Governor.

[4] There is no provision in article 39, or in any other article of the Constitution, defining the manner in which bills shall be described in the entries in the Official Journal of the House of Representatives or of the Senate. Whatever doubt might otherwise appear by reference to the description of this House Bill No. 387, as recorded in the last entry in the House Journal and in all entries in the Senate Journal, is removed by the positive proof, furnished by the original documents themselves, that the title under which this bill was read each time in the House and in the Senate, under which it was enrolled and signed by the Speaker of the House and by the Lieutenant Governor and President of the Senate and taken to the

Governor' for executive approval, and the title under which it was approved and signed by the Governor, was the short title under which the statute was promulgated.

[5] In Hollingsworth v. Thompson, Tax Collector, 45 La. Ann. 222, 12 South. 1, 40 Am. St. Rep. 220, this court approved and adopted the doctrine stated in Gardner v. Barney, Collector, 6 Wall. 499, 18 L. Ed. 890, viz.:

"We are of the opinion, therefore, on principle as well as authority, that whenever a question arises in a court of law of the existence of a statute, or of the time when a statute took effect, or of the precise terms of a statute, the judges who are called upon to decide it, have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory answer to such question; always seeking first for that which in its nature is most appropriate, unless the positive law has enacted a different rule."

The doctrine quoted was affirmed again in State ex rel. Caillouet v. Laiche, Clerk, 105 La. 84, 29 South. 700, where it was said that the presumption of regularity of the proceedings of the General Assembly should supply apparent omissions in the legislative journals, viz.:

"If the act, as approved by the Governor and as subsequently promulgated, had contained the Senate amendment as to the time when it should go into effect, it would matter not that the House Journal makes no specific mention of that amendment nor of its having been adopted by the House. It would have sufficed that the journal showed generally the Senate amendments had been adopted, thus bringing the case within the rule of Hollingsworth v. The Tax Collector, 45 La. Ann. 222 [12 South. 1], viz.: That in such case, the court will supply apparent omissions from legislative journals by presumptions of regularity of the proceedings of the General Assembly."

Our conclusion is that the Act 177 of 1920 was adopted in conformity with the constitutional provisions referred to, and that it is valid legislation.

The judgment appealed from is annulled, and it is ordered that this case be remanded to the district court for further proceedings not inconsistent with the foregoing opinion.